**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL; CALIFORNIA TROUT; SAN FRANCISCO BAYKEEPER; FRIENDS OF THE RIVER; THE BAY INSTITUTE, all non-profit organizations, *Plaintiffs-Appellants*, | No. 09-17661<br><br>D.C. No. 1:05-cv-01207-OWW-GSA |
| and | OPINION |
| METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA, Plaintiff in Related Case, *Plaintiff*, | |
| v. | |
| SALLY JEWELL, in her official capacity as Secretary of the Interior;[*] DAN ASHE, in his official capacity as Director of the U.S. Fish and Wildlife Service; MICHAEL J. CONNOR, in his official capacity as Commissioner of the U.S. Bureau of Reclamation; ANDERSON-COTTONWOOD IRRIGATION DISTRICT; PACIFIC REALTY | |

---

[*] Sally Jewell is substituted for her predecessor, Kenneth L. Salazar, as Secretary of the Interior. Fed. R. App. P. 43(c)(2).

ASSOCIATES, LP; RECLAMATION
DISTRICT 1004; BEVERLY F.
ANDREOTTI; BANTA-CARBONA
IRRIGATION DISTRICT; PATTERSON
IRRIGATION DISTRICT; WEST SIDE
IRRIGATION DISTRICT; BYRON
BETHANY IRRIGATION DISTRICT;
CARTER MUTUAL WATER COMPANY;
HOWALD FARMS, INC.; MAXWELL
IRRIGATION DISTRICT; MERIDIAN
FARMS WATER COMPANY; OJI
BROTHERS FARMS, INC.; HENRY D.
RICHTER; SUTTER MUTUAL WATER
CO.; TISDALE IRRIGATION AND
DRAINAGE COMPANY; WINDSWEPT
LAND AND LIVESTOCK COMPANY;
CITY OF REDDING; COELHO FAMILY
TRUST; EAGLE FIELD WATER
DISTRICT; MERCY SPRINGS WATER
DISTRICT; ORO LOMA WATER
DISTRICT; CONAWAY PRESERVATION
GROUP; DEL PUERTO WATER
DISTRICT; WEST STANISLAUS
IRRIGATION DISTRICT; FRESNO
SLOUGH WATER DISTRICT; JAMES
IRRIGATION DISTRICT;
TRANQUILLITY IRRIGATION
DISTRICT; CHRISTO D. BARDIS;
ABDUL RAUF; TAHMINA RAUF;
DAVID AND ALICE TE VELDE
FAMILY TRUST; FRED TENHUNFELD;
FAMILY FARM ALLIANCE,
*Defendants-Appellees*,

SAN LUIS & DELTA-MENDOTA
WATER AUTHORITY; WESTLANDS
WATER DISTRICT; CALIFORNIA
FARM BUREAU FEDERATION; STATE
WATER CONTRACTORS; CALIFORNIA
DEPARTMENT OF WATER
RESOURCES; GLENN-COLUSA
IRRIGATION DISTRICT; NATOMAS
CENTRAL MUTUAL WATER
COMPANY; PELGER MUTUAL WATER
COMPANY; PLEASANT GROVE-
VERONA MUTUAL WATER
COMPANY; RECLAMATION DISTRICT
108; RIVER GARDEN FARMS
COMPANY; PRINCETON-CODORA-
GLENN IRRIGATION DISTRICT;
PROVIDENT IRRIGATION DISTRICT;
KERN COUNTY WATER AGENCY,
          *Defendant-intervenors–Appellees.*

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted En Banc
September 19, 2013—San Francisco, California

Filed April 16, 2014

Before: Alex Kozinski, Chief Judge, M. Margaret McKeown, Kim McLane Wardlaw, Raymond C. Fisher, Ronald M. Gould, Richard C. Tallman, Johnnie B. Rawlinson, Richard R. Clifton, Consuelo M. Callahan, Milan D. Smith, Jr., and N. Randy Smith, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

## SUMMARY[**]

---

### Endangered Species Act

The en banc court reversed the district court's judgment in favor of federal defendants in an action brought by environmental groups concerning long-term water contracts the federal Bureau of Reclamation entered pertaining to California's Central Valley Project, the threatened delta smelt, and the requirement under Section 7(a)(2) of the Endangered Species Act that federal agencies must consult with the United States Fish and Wildlife Service or the National Oceanic and Atmospheric Administration's National Marine Fisheries Service prior to taking any agency action that could affect an endangered or threatened species or its critical habitat.

The en banc court held that intervening events did not render the action moot. The en banc court also held that the contractual provisions of the Delta-Mendota Canal Unit Water Services Contracts before the court did not deprive

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

plaintiffs of standing to bring a procedural challenge under Section 7(a)(2) of the Endangered Species Act. Further, concerning the Sacramento River Settlement Contracts, the en banc court held that the federal Bureau of Reclamation was required to engage in Section 7(a)(2) consultation because, in renewing the challenged contracts, it retained "some discretion" to act in a manner that would benefit the delta smelt.

## COUNSEL

Barbara J. Chisholm (argued), Hamilton Candee, Casey A. Roberts, Rachel J. Zwillinger, Altshuler Berzon LLP, San Francisco, California; Katherine Poole, Douglas Andrew Obegi, Natural Resources Defense Council, San Francisco, California; Trent W. Orr, Michael R. Sherwood, Earthjustice, Oakland, California, for Plaintiffs-Appellants.

Robert H. Oakley (argued), Andrew C. Mergen, Environment & Natural Resources Division, Department of Justice, Washington, D.C.; Ignacia S. Moreno, Assistant Attorney General, Environment & Natural Resources Division, Washington, D.C., for Federal Defendants-Appellees.

Stuart L. Somach (argued), Andrew M. Hitchings, Somach Simmons & Dunn, Sacramento, California; Steven P. Saxton (argued), Kevin M. O'Brien, Downey Brand LLP, Sacramento, California; J. Mark Atlas, Attorney at Law, Willows, California; Jeffrey A. Meith, David Steffenson, Minasian, Spruance, Meith, Soares & Sexton, LLP, Oroville, California; Lynette M. Frediani, City of Redding, Redding, California; Scott A. Morris, Daniel J. O'Hanlon, Hanspeter

Walter, Rebecca R. Akroyd, Kronick, Moskovitz, Tiedemann
& Girard, Sacramento, California; Steven Lamon, John
Fischer, Murphy Austin Adams Schoenfeld LLP,
Sacramento, California, for Defendant-Intervenors-Appellees.

---

## OPINION

M. SMITH, Circuit Judge:

In this appeal, we address the requirement under Section
7(a)(2) of the Endangered Species Act (ESA), 16 U.S.C.
§ 1531 *et seq*., that federal agencies must consult with the
United States Fish and Wildlife Service (FWS) or the
National Oceanic and Atmospheric Administration's National
Marine Fisheries Service (Service) prior to taking any agency
action that could affect an endangered or threatened species
or its critical habitat. We reaffirm that Section 7(a)(2)
requires such consultation, so long as the agency has "some
discretion" to take action for the benefit of a protected
species. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d
1006, 1024 (9th Cir. 2012) (en banc) (quoting *NRDC v.
Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998)). We hold
that: (1) intervening events have not rendered this action
moot; (2) the contractual provisions before us do not deprive
Plaintiffs-Appellants (Plaintiffs) of standing to bring a
procedural challenge under Section 7(a)(2); and (3) the
federal Bureau of Reclamation (Bureau) was required to
engage in Section 7(a)(2) consultation because, in renewing
the challenged contracts, it retained "some discretion" to act
in a manner that would benefit the delta smelt. We therefore
reverse the district court's judgment and remand for further
proceedings.

## I.  Background

### A.  Statutory Structure

The ESA protects endangered and threatened species and their critical habitats.  Under the ESA, the Secretary of the Interior and the Secretary of Commerce are charged with identifying threatened and endangered species and designating critical habitats for those species.  16 U.S.C. § 1533.  The FWS and the Service administer the ESA.  *See* 50 C.F.R. §§ 17.11, 222.101(a), 223.102, 402.01(b).

Section 7 of the ESA requires federal agencies to ensure that none of their activities jeopardizes the continued existence of endangered or threatened species or adversely modifies those species' critical habitats.  16 U.S.C. § 1536(a)(2); *see also Karuk Tribe*, 681 F.3d at 1020. Section 7's implementing regulations provide that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat[s]."  50 C.F.R. § 402.14(a).  If an agency determines that an action may affect a listed species or habitat, Section 7(a)(2) requires that the agency consult with the FWS or the Service before engaging in the action. We have previously explained:

> The purpose of consultation is to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts.  The consultation requirement

reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies."

*Karuk Tribe*, 681 F.3d at 1020 (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978) and citing *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003)).

Section 7(a)(2) consultation is required so long as the federal agency has "some discretion" to take action for the benefit of a protected species. *Karuk Tribe*, 681 F.3d at 1024 (quoting *Houston*, 146 F.3d at 1126 and citing *Turtle Island*, 340 F.3d at 974–75; *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of the Navy*, 383 F.3d 1082, 1092 (9th Cir. 2004)). There is no duty to consult, however, for actions "that an agency is *required* by statute to undertake." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 928 (9th Cir. 2008) (stating that this exception resolves "the problem of an agency being unable to 'simultaneously obey' both Section 7 and a separate statute which expressly requires an agency to take a conflicting action" (quoting *Home Builders*, 551 U.S. at 666)); 50 C.F.R. § 402.03 (providing that Section 7(a)(2) consultation is only required for proposed agency actions over which "there is discretionary Federal involvement or control").

Once Section 7(a)(2) consultation is complete, the FWS or the Service must provide the agency with a written biological opinion "setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the

species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h). If the Secretary concludes that the proposed agency action would place the listed species in jeopardy or adversely modify its critical habitat, "the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate [Section 7(a)(2)] and can be taken by the Federal agency . . . in implementing the agency action." 16 U.S.C. § 1536(b)(3)(A).

## B. Factual and Procedural History

The Bureau manages California's Central Valley Project—a series of dams, reservoirs, canals, and pumps that diverts and draws water from the California River Delta. The Central Valley Project delivers approximately seven million acre-feet of water to California water users each year and is one of the largest water storage and distribution systems in the world.

The delta smelt is a small fish that lives in the California River Delta. In 1993, the FWS concluded that the delta smelt's population had declined by ninety percent over the previous twenty years and listed it as a "threatened" species under the ESA. Determination of Threatened Status for the Delta Smelt, 58 Fed. Reg. 12,854, 12,855 (Mar. 5, 1993). The FWS further determined that "Delta water diversions," including the Central Valley Project, are the most significant "synergistic cause[]" of the decline in the delta smelt population. *Id*. at 12,859.

In the 1960s, the Bureau entered into a number of long-term contracts pertaining to the Central Valley Project. In 2004, two groups of these contracts had expired, or were

about to expire: (1) the Delta-Mendota Canal Unit Water Service Contracts (DMC Contracts); and (2) the Sacramento River Settlement Contracts (Settlement Contracts). (The DMC Contracts and the Settlement Contracts are sometimes referred to collectively as the Contracts.) The Settlement Contracts are forty-year agreements between the Bureau and holders of certain senior water rights. These contracts grant the Bureau some rights to the encumbered water while also providing senior rights holders a stable supply of water. The DMC Contracts are water supply agreements that allow water users, who do not claim rights as senior users, to draw water from the Delta-Mendota Canal.

In the early 2000s, the Bureau prepared a proposed Operations Criteria and Plan (Plan) to, *inter alia*, provide a basis for renewing the Contracts. Pursuant to Section 7 of the ESA, the Bureau next initiated consultation with the FWS regarding the effect of the proposed Plan on the delta smelt. The FWS rendered an initial Biological Opinion in 2004 (the 2004 Opinion), which concluded that the Bureau's Plan would not jeopardize the delta smelt. We subsequently invalidated the 2004 Opinion. *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004), *amended by* 387 F.3d 968 (9th Cir 2004). In 2005, the FWS issued a revised Biological Opinion (the 2005 Opinion), which also concluded that the Plan would not jeopardize the delta smelt. The district court invalidated the 2005 Opinion, and the Bureau did not appeal.

Also in 2004 and 2005, the Bureau itself prepared biological assessments that concluded that renewal of the Contracts would not adversely affect the delta smelt. The Bureau also requested additional consultation with the FWS regarding its plans to renew the Contracts. The FWS

responded via a series of letters, in which it concurred with the Bureau's determination that renewing the Contracts was not likely to adversely affect the delta smelt. Each FWS concurrence letter explained that renewing the Contracts would increase the demand for water, but that, according to the 2004 Opinion and the 2005 Opinion, this demand would not adversely affect the delta smelt. The letters did not assess the Contracts' potential effects on the delta smelt beyond the reasoning borrowed from the invalidated 2004 Opinion and 2005 Opinion.

Throughout 2004 and 2005, the Bureau renewed 141 Settlement Contracts and 18 DMC Contracts based on the FWS' concurrence letters. On December 15, 2008, the FWS issued a revised Biological Opinion (the 2008 Opinion), which, contrary to the findings of the 2004 Opinion and 2005 Opinion, concluded that the Bureau's Plan would jeopardize the delta smelt and adversely modify its critical habitat.

In 2008, Plaintiffs filed a Third Amended Complaint in the United States District Court for the Eastern District of California, challenging the validity of the 41 renewed Contracts that they deem most harmful to the delta smelt. In seeking to set aside these contracts, Plaintiffs argue that the Bureau violated Section 7(a)(2) of the ESA by failing to adequately consult with the FWS prior to renewing the Contracts. In a series of opinions, the district court granted summary judgment in favor of Defendants-Appellees (Defendants). The district court held that Plaintiffs lack Article III standing to challenge the DMC Contracts because Plaintiffs cannot establish that their injuries are fairly traceable to the Bureau's alleged procedural violation. The district court further held that, while Plaintiffs have standing to challenge the Settlement Contracts, Plaintiffs' claims

regarding these contracts fail as a matter of law because Section 7(a)(2)'s consultation requirement does not apply to the Settlement Contracts.

## II. Analysis

### A. Mootness

We first consider whether intervening events have rendered this action moot. Defendants argue that this appeal is now moot because after the 2005 Biological Opinion was invalidated, the Bureau engaged in a renewed consultation with the FWS, which led to the issuance of the 2008 Opinion.

### 1. Legal Standard

Article III's "case-or-controversy" requirement bars federal courts from deciding "'questions that cannot affect the rights of litigants in the case before them.'" *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (per curiam) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam)). It is not enough that a case presents a live controversy when it is filed; an actual controversy must exist at all stages of federal court proceedings. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189–90 (2000).

A case is not moot if a federal court can grant the parties any effective relief. *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). Moreover, "[t]he party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." *Id.*

## 2. Discussion

This action is not moot because the 2008 Opinion does not provide Plaintiffs with the relief that they seek. The 2008 Opinion concluded that the Bureau's Plan would likely jeopardize the delta smelt and adversely modify its critical habitat. In so doing, the 2008 Opinion explained that the Bureau's Plan must be modified from what the Bureau envisioned in 2004 and 2005, and the Opinion identified a "reasonable and prudent alternative" to the proposed Plan that would avoid jeopardizing the delta smelt.

The issuance of the 2008 Opinion does not moot this appeal. The 2008 Opinion merely assesses the general effects of the Bureau's Plan, and it does not represent a consultation with the FWS concerning the impact of the Bureau's decision to renew the specific contracts before us. Although the DMC Contracts and Settlement Contracts were renewed based on now-invalidated opinions, the Bureau has never reconsulted with the FWS regarding the effects of renewing these contracts, nor has it sought to amend the challenged contracts to incorporate the protections proposed in the 2008 Opinion. The remedy Plaintiffs seek is an injunction requiring reconsultation with the FWS and renegotiation of the challenged contracts based on the FWS' assessment. This relief remains available.

## B. Standing—The DMC Contracts

The district court held that Plaintiffs lack standing to challenge the validity of the DMC Contracts because Plaintiffs cannot establish that their injury is fairly traceable to the Bureau's alleged procedural violation. The district court reasoned that: (1) the DMC Contracts contain a

provision that absolves the government from liability for breaches that result from complying with its legal obligations (the shortage provision); (2) this provision permits the Bureau to take necessary actions to meet its legal obligations under the ESA; so (3) the Bureau could not have negotiated any contractual terms that better protect the delta smelt, and any injury to the delta smelt is not traceable to the contract renewal process. We reject the district court's reasoning.

## 1. Legal Standard

To establish Article III standing, a plaintiff must demonstrate that: (1) he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Friends of the Earth*, 528 U.S. at 180–81 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). One who challenges the violation of "a procedural right to protect his concrete interests can assert that right without meeting all the normal standards" for traceability and redressibility. *Lujan*, 504 U.S. at 572 n.7. Such a litigant need only demonstrate that he has "a procedural right that, if exercised, *could* protect [his] concrete interests and that those interests fall within the zone of interests protected by the statute at issue." *Defenders of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 957 (9th Cir. 2005), *rev'd in part on other grounds by Home Builders*, 551 U.S. 664.

We have held that alleged violations of Section 7(a)(2)'s consultation requirement constitute a procedural injury for standing purposes. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003) (citing *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1079

(9th Cir. 2001)); *see also Defenders of Wildlife*, 420 F.3d at 957. For this reason, to establish standing, a litigant who asserts a procedural violation under Section 7(a)(2) need only demonstrate that compliance with Section 7(a)(2) *could* protect his concrete interests. *Defenders of Wildlife*, 420 F.3d at 957.

## 2. Discussion

Plaintiffs contend that the Bureau violated Section 7(a)(2) by failing to adequately consult with the FWS regarding threats to the delta smelt, and by renewing the DMC Contracts in reliance on what it knew, or should have known, to be a faulty analysis by the FWS. The district court held that Plaintiffs lack standing to bring this claim because the DMC Contracts contain a shortage provision that provides:

> If there is a Condition of Shortage [of water] because of errors in physical operations of the Project, drought, other physical causes beyond the control of the Contracting Officer or actions taken by the Contracting Officer to meet legal obligations then, except as provided in subdivision (a) of Article 18 of this Contract, no liability shall accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom.

The district court reasoned that, because this provision absolves the Bureau of liability if it breaches certain contractual provisions "'to meet legal obligations' such as Section 7(a)(2) of the ESA," the Bureau could not have negotiated DMC Contracts that would provide the delta smelt

with any greater protection. Therefore, the district court concluded that "[the] shortage provision[] break[s] any chain of [causality] between the execution . . . of the DMC Contracts and harm to the delta smelt."

The district court erred in holding that the shortage provision deprives Plaintiffs of standing to challenge the DMC Contracts. Because Plaintiffs allege a procedural violation under Section 7 of the ESA, they need only show that, if the Bureau engages in adequate consultation, the DMC Contracts *could* better protect Plaintiffs' concrete interest in the delta smelt than the contracts do currently. *Defenders of Wildlife*, 420 F.3d at 957.

Contrary to the district court's finding, the shortage provision does not provide the delta smelt with the greatest possible protection. Nothing about the shortage provision requires the Bureau to take actions to protect the delta smelt. The provision is permissive, and merely absolves the United States of liability if there is a water shortage resulting from, *inter alia*, "actions taken . . . to meet legal obligations." But even if we read the provision to place an affirmative obligation on the Bureau to take actions to benefit the delta smelt, the provision only concerns the quantity of water that will be made available to the DMC Contractors. There are various other ways in which the Bureau could have contracted to benefit the delta smelt, including, for example, revising the contracts' pricing scheme or changing the timing of water deliveries. Because adequate consultation and renegotiation could lead to such revisions, Plaintiffs have standing to assert a procedural challenge to the DMC Contracts.

## C. Section 7(a)(2)'s Consultation Requirement—The Settlement Contracts

The district court also held that, although Plaintiffs have standing to assert procedural challenges to the Settlement Contracts, Plaintiffs' claims regarding these contracts fail as a matter of law. The court reasoned that the Bureau was not required to consult under Section 7(a)(2) prior to renewing the Settlement Contracts because the Bureau's discretion in renegotiating these contracts was "substantially constrained." We reverse this determination, because consultation is required whenever the agency has "some discretion" to take action for the benefit of a protected species. *Karuk Tribe*, 681 F.3d at 1024 (quoting *Houston*, 146 F.3d at 1126 and citing *Turtle Island*, 340 F.3d at 974–75; *Ground Zero Ctr. for Non-Violent Action*, 383 F.3d at 1092).

### 1. Legal Standard

Section 7(a)(2)'s consultation requirement is triggered so long as a federal agency retains "some discretion" to take action for the benefit of a protected species. *Karuk Tribe*, 681 F.3d at 1024 (quoting *Houston*, 146 F.3d at 1126 and citing *Turtle Island*, 340 F.3d at 974–75; *Ground Zero Ctr. for Non-Violent Action*, 383 F.3d at 1092). Whether an agency must consult does not turn on the *degree* of discretion that the agency exercises regarding the action in question, but on whether the agency has any discretion to act in a manner beneficial to a protected species or its habitat. *See Karuk Tribe*, 681 F.3d at 1024–25 (explaining that the relevant consideration is only whether the agency *could* influence third party activities to protect a listed species); *see also Nat'l Wildlife Fed'n*, 524 F.3d at 928–29 (holding that consultation is required so long as it is possible for the agency to comply

with both the ESA and other statutory requirements). The agency lacks discretion only if another legal obligation makes it impossible for the agency to exercise discretion for the protected species' benefit. *Id.* at 927–28 (citing *Home Builders*, 551 U.S. at 669).

## 2. Application

In holding that the Bureau was not required to consult under Section 7(a)(2) prior to renewing the Settlement Contracts, the district court focused on Article 9(a) of the original Settlement Contracts, which provides in pertinent part:

> During the term of this contract and any renewals thereof: (1) It shall constitute full agreement as between the United States and the Contractor *as to the quantities of water and the allocation thereof* between base supply and Project water which may be diverted by the Contractor from its source of supply for beneficial use on the land shown on Exhibit B . . . ; (2) The Contractor shall not claim any right against the United States in conflict with the provisions hereof.

(emphasis added). According to the district court, the Bureau was not required to consult because this provision "substantially constrained" the Bureau's discretion to negotiate new terms in renewing the contracts.

In so concluding, the district court applied an erroneous standard. Section 7(a)(2)'s consultation requirement applies with full force so long as a federal agency retains "some

discretion" to take action to benefit a protected species. *Karuk Tribe*, 681 F.3d at 1024 (quoting *Houston*, 146 F.3d at 1126 and citing *Turtle Island*, 340 F.3d at 974–75; *Ground Zero Ctr. for Non-Violent Action*, 383 F.3d at 1092). While the parties dispute whether Article 9(a) actually limits the Bureau's authority to renegotiate the Settlement Contracts, it is clear that the provision does not strip the Bureau of all discretion to benefit the delta smelt and its critical habitat.

First, nothing in the original Settlement Contracts requires the Bureau to renew the Settlement Contracts. Article 2 of the original contracts provides that "renewals *may* be made for successive periods not to exceed forty (40) years each." (emphasis added). This language is permissive and does not require the Bureau to execute renewal contracts.[1] Since the FWS has concluded that "Delta water diversions" are the most significant "synergistic cause[]" of the decline in delta smelt, 58 Fed. Reg. at 12,859, it is at least plausible that a decision not to renew the Settlement Contracts could benefit the delta smelt and their critical habitat.

But even assuming, *arguendo,* that the Bureau is obligated to renew the Settlement Contracts and that Article 9(a) limits the Bureau's discretion in so doing, Article 9(a) simply constrains future negotiations with regard to "the quantities of water and the allocation thereof . . . ." Nothing in the provision deprives the Bureau of discretion to renegotiate contractual terms that do not directly concern water quantity and allocation. And, as previously noted with

---

[1] We recognize that the Central Valley Project is governed by a complicated set of federal and state laws, and we express no view as to whether other legal obligations may compel the Bureau to execute renewal contracts with holders of senior water rights.

respect to the DMC Contracts, the Bureau could benefit the delta smelt by renegotiating the Settlement Contracts' terms with regard to, *inter alia*, their pricing scheme or the timing of water distribution.

For these reasons, we conclude that, in renewing the Settlement Contracts, the Bureau retained "some discretion" to act in a manner that would benefit the delta smelt. The Bureau was therefore required to engage in Section 7(a)(2) consultation prior to renewing the Settlement Contracts.

## III.    Conclusion

We reverse the district court's judgment and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**